In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-2968

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CARL C. ADAMS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 1:09-cr-10094—**Joe Billy McDade**, *Judge.*

ARGUED JUNE 3, 2011—DECIDED JULY 22, 2011

Before EVANS and WILLIAMS, *Circuit Judges*, and
CONLEY, *District Judge.*[*]

EVANS, *Circuit Judge.* Carl Adams entered a guilty
plea to a charge of using the Internet to traffic in child

---

[*] The Honorable William M. Conley, United States District
Court for the Western District of Wisconsin, sitting by designa-
tion.

pornography. 18 U.S.C. §§ 2252A(a)(1) and (b)(1). All sides agreed that the correct guideline range for the offense was 210 to 262 months. However, because the statutory maximum penalty was 240 months, the range was compressed to 210 to 240 months. The government argued for a sentence of 210 months, the bottom of the unchallenged range. Adams argued for a sentence of 60 months, the statutory minimum for the offense. The judge imposed a term of 180 months. Adams appeals.

The nub of the appeal lies in Adams' argument that his sentence was inflicted with procedural error. He claims that the judge believed (wrongly) that Adams, and others like him, suffer "from an uncontrollable illness when no such evidence was contained in the record and uncontradicted studies establish that consumers of child pornography have low rates of recidivism and are not a high risk to commit *contact* offenses." (Emphasis added.)

The events that led to the indictment against Adams kicked off in 2007 when an FBI task force agent in Florida accessed the peer-to-peer program "LimeWire" through the Internet as part of an undercover investigation into child pornography.[1] After the agent entered various

---

[1] LimeWire, according to Wikipedia, is a free-access file-sharing program that allows users to make files available to all other LimeWire users by placing them in a shared folder. Any LimeWire user may access that folder to download files, but they may not add to another user's shared folder. This

(continued...)

search terms associated with child pornography, he was connected to Adams' computer, from which the agent downloaded nine files containing child pornography. The presentence report (PSR) described the images as depicting:

> a prepubescent girl exposing her genitalia while wearing underwear; a nude prepubescent girl spreading her legs and labia with semen and bruises on the labia; a nude prepubescent girl lying on her stomach, exposing her vagina and anus (2 copies); a nude prepubescent girl bound to a bench lying face down wearing a dog collar; two nude prepubescent girls under the age of 13 holding an adult male penis while one of the girls performs oral sex on said penis; a nude prepubescent girl under the age of 13 performing oral sex on a male penis (2 copies); and a prepubescent girl under the age of 12 sitting in a vehicle nude from the waist down, exposing her vagina and wearing a dog collar.

Acting on the Florida agent's investigation, law enforcement officers in Illinois executed a search warrant at Adams' home in Pontiac. They found two computers. The first computer was operating on a desk, and the second was stored in a box. Adams, who was home during the search, told the officers that he was the sole user of both computers. Adams said that he purchased the stored computer in 2005 and used it until he purchased the

---

[1] (...continued)
appears to mean that if a file is in a LimeWire user's shared folder, then that user put it there.

computer that was on the desk. Adams admitted that he had installed and used LimeWire on the operating computer to download music, videos, and adult pornography but denied that he had ever searched for child pornography.

Following the search, a computer expert examined the seized computers and found that they contained 4,567 pornographic images, 639 of which were child pornography.[2] When examining the stored computer, the expert recovered nine Internet chats that took place in September 2005 between Adams and other Internet users. During the chats, Adams expressed his sexual interest in children and exchanged and received more than 150 images containing child pornography. Here are a few examples (we apologize for their graphic detail), all from the PSR, of the chats:

> In one chat, the other user asked Adams, "what ages you trade?" Adams responded, "any . . . I love younger girls . . . send I'll match." During the chat, Adams exchanged and received 12 images of child pornography.

> In another chat, Adams asked the other user, "what do u like[?]" The user replied, "young girls playing with big hard cocks . . . u?" Adams responded, "me too." Later in the chat, the user asked Adams, "would

---

[2] In his appellate brief and at oral argument, Adams and his lawyer argued that this fact actually cuts in Adams' favor because it reveals that less than 15% of all of the pornography he possessed was child-related. We fail to see anything meritorious in these numbers.

you like to watch a 10 girl suck my cock[?]" Adams replied, "yes." During this chat, Adams exchanged and received 109 images of child pornography.

And in another chat, Adams told the other user, "I love oral . . . 12 and under . . . cumshots." During this chat, Adams exchanged and received 25 images of child pornography.

Against this backdrop, Adams had several factors to present to the judge in his favor at sentencing. He was 38 years old, single, and had no children. He was born and raised in Pontiac and had no criminal record. He served in the Air Force (1991-1995) and was honorably discharged. He worked regularly on several blue-collar jobs after leaving the Air Force, and he had a close-knit family that supported him by sending letters to the judge regarding the sentence that should be imposed. The only blemish on his record, and even he acknowledged it, was excessive drinking over the course of most of the last 15 years.

Adams also argued that he did not pose a particular threat to commit sexual assaults against minors in the future, presenting the judge with two research studies in support of his position. The studies, Adams asserted, concluded that "viewing child pornography itself is not a risk factor for committing 'hands-on' or 'contact' offenses against minors, at least for those who have not committed hands-on or contact offenses in the past." At sentencing, Adams' lawyer also noted that there was no evidence that Adams had even looked at child pornography after his computers were seized in 2007.

The judge began his remarks by discussing the seriousness of the crime, which he believed was not truly appreciated. The judge explained that, unlike in television or in the movies, the conduct depicted in child pornography "happened to 9, 10, 11, 12, 13-year-old children . . . . And every time someone watches it, like Mr. Adams, that's creating a market, and that's encouraging that person and others like him to continue to make that kind of filth. . . . to continue to exploit helpless children."

The judge then acknowledged the mitigating factors that we previously discussed and concluded that there was no reason to doubt Adams' sincerity when he said that he would never commit the crime again. But the judge said that he could not be certain:

> [S]ometimes our needs and our desires are so strong that they overcome our good judgment, our will. And in my judgment, attraction to child pornography is an illness because I don't see how any reasonable good person would find pleasure in that, certainly, watching some helpless child and sometimes infants be abused. So to get pleasure in that, suggests to me it may be beyond one's control.

Immediately thereafter, however, the judge stated that maybe he "should back off on that" because there was no evidence that Adams had not controlled his desires since 2007. The judge determined that, if he were only looking at Adams' likelihood of recidivism, he "would be much more responsive to Mr. Adams and his attorney's plea for the minimum of five years."

However, the law also required the judge to examine "what would deter other people who may have a predisposition to child pornography." On that issue, the judge said that he sought to impose a sentence "that would cause someone right now sitting at their computer who has a desire to see child pornography to say, wait a minute, if I'm caught, I'm going to get a stiff sentence and it is not worth it. I better go get some treatment."

The judge concluded his remarks by acknowledging that Adams was not charged with acting on his desires. Nevertheless, the judge said that what Adams had done—specifying the particular images that he wanted, downloading images of children being abused, and actively trading images with others—indicated that Adams had "a problem that is fueling the abuse of our children."

To repeat, Adams only takes issue with the judge's comments concerning whether Adams, and others like him, suffer from an uncontrollable illness. Adams claims that the judge committed procedural error by relying on an unsupported conclusion that people who view child pornography are unable to control their actions. Whether a district judge followed proper procedures in determining a sentence is a question of law that we review *de novo*. *United States v. Glosser*, 623 F.3d 413, 418 (7th Cir. 2010).

The judge first mentioned the word "illness" in his discussion of the seriousness of the crime and Adams' likelihood of recidivism. There is nothing in the record to suggest the judge was making a finding of mental

illness. Instead, he was struggling with the severity of the crime and wondering why anyone would choose to view images like those that Adams had viewed. The judge surmised that such a desire was so unreasonable that perhaps it was beyond a person's control.

Moreover, immediately after these comments, the judge said that he may need to "back off" on that belief because Adams had apparently controlled his desires since 2007. The judge then explicitly stated that if his only consideration were Adams' likelihood of recidivism, he would be more responsive to Adams' requested five-year sentence. Thus, the judge's initial discussion of an attraction to child pornography as an "illness" did not dictate the ultimate sentence.

Instead, the judge imposed a sentence above Adams' request primarily because of the need to deter others from engaging in similar crimes. The judge explained that Adams' sentence needed to "cause someone right now sitting at their computer who has a desire to see child pornography to say, wait a minute, if I'm caught, I'm going to get a stiff sentence and it is not worth it. I better go get some treatment." These comments do not amount to a finding that all child pornographers suffer from an illness beyond their control[3] (indeed, if the

---

[3] The judge's comments do not even suggest that he was referring to an "illness" in a clinical sense. Even if he were, the comments are not inconsistent with the two recent studies Adams' counsel brought to the attention of the court, since

(continued...)

illness were truly uncontrollable, attempts at deterrence would be futile). Rather, the judge sought to encourage people who have problematic desires similar to Adams' to remedy them—with help, if necessary. There is nothing improper about sending this message.

True, the judge did not mention the studies that Adams presented. But, as Adams concedes, a judge is not required to address every argument raised by a defendant at sentencing. *United States v. Cunningham*, 429 F.3d 673, 678 (7th Cir. 2005). Furthermore, here, the judge specifically acknowledged that Adams was not charged with a contact offense and, as we previously discussed, determined that Adams was rather unlikely to recidivate. Thus, there is no indication that Adams was sentenced based on findings contradicted by the studies.

In the end, the judge arrived at a below-guidelines sentence by properly considering, among other things, the seriousness of the offense and the need to provide

---

[3] (...continued)

neither focus on whether an attraction to child pornography can accurately be described as an "illness," treatable or otherwise, but rather on the apparent lack of correlation between the viewing of child pornography and recidivism, particularly future "hands-on" sexual assault of children. Indeed, though not formally recognized as an "addiction"—as is compulsive gambling—the DSM-IV-TR defines among "paraphilias" the "recurrent, intense sexually arousing fantasies, sexual urges, or behaviors generally involving . . . children or other nonconsenting persons."

deterrence. Accordingly, the judgment of the district court is AFFIRMED.